Morris Kratchman, Appellant, v. North British and Mercantile Insurance Company, Limited, of England, a Corporation, Respondent.—203 S. W. 2d 483.

Kansas City Court of Appeals. Opinion delivered June 2, 1947.

C. B. DuBois and C. W. Crossman for appellant.

*Alvin C. Trippe, Hale Houts* and *Hogsett, Trippe, Depping & Houts,* for respondent.

300

DEW, J.—Plaintiff sued to recover the full amount of a fire insurance policy. The verdict of the jury and the judgment were for the defendant. Plaintiff appealed.

The cause of action is based on a fire insurance policy #984035, bearing date August 20, 1944, issued by defendant's agent in Lawrence, Kansas, in the face amount of $2000, insuring Sophie Firestone and Bernard Firestone for one year against loss or damage by fire. The policy, as pleaded and introduced by plaintiff, insures furniture and other personal property situated at 808-810 Massachusetts Street, Lawrence, Kansas. It is admitted that on March 1, 1945, a fire occurred at that location. For the purposes of this appeal it may be considered that the loss exceeded the policy in question and other policies on the property, and that Sophie and Bernard Firestone were the owners of the personal property there situated at the time. Some time subsequently to the fire, their interest in the said policy and claim was assigned to the plaintiff.

The part of the answer necessary here to consider was, in effect, that at the time of the fire said policy was not in force and effect on the property located at the address given above, but that at the request of Sophie and Bernard Firestone, and under an agreement between them and the defendant, said policy had been transferred to cover property located at 732 Massachusetts Street, Lawrence, Kansas, and there only, and was in effect as to property there located at the time of the alleged fire at 808-810 Massachusetts Street; that in accordance with such agreement to transfer, the removal permit therefor was mailed to said insured and received by them, all of which facts they knew long prior to the fire. For the reason stated, defendant denied liability on the policy here sued on. Plaintiff, by reply, denied the new matter set fourth in the answer.

Bernard Firestone, in behalf of the plaintiff, testified to the ownership by himself and wife of the contents destroyed by the fire at 808-810 Massachusetts Street, Lawrence, Kansas, and that the building in which the store was located belonged to the plaintiff, his father-in-law, who lives in Kansas City, Missouri; that at the time the witness and his wife purchased the business, about May 1, 1944, there was $8000 fire insurance on the merchandise covered by three policies, two of which were written by the defendant company of which one was for $2000. These policies were then assigned to the Firestones. About July, 1944, the Firestones acquired warehouse space at 732 Massachusetts Street, about one block north of the store. They kept new furniture in the warehouse location until it was desired to move it to the store building. He said he never had moved any merchandise from the store building to the warehouse. Through Mr. Hartley, representing the local agent for the defendant, he ordered the three policies on the contents at the store renewed for a year from August 20, 1944. On March 1, 1945,

a fire occurred at the store at 808-810 Massachusetts Street. Later on that day an adjuster came to the scene of the fire and inquired as to the stock in the building and arranged to come back to see him again as soon as witness could get his papers out of the safe. He asked the witness to prepare an inventory of the loss; that the loss of contents in the building was $9,930. This information he conveyed to the adjuster. The adjuster told him that the loss would exceed the total amount of the insurance, $8000. When the blank was furnished on which to prepare proof of loss it was made out for $6000 and witness refused to sign it. Later he had his attorney prepare the proof of loss, and his claim for $2000 under the policy in question. In the claim made they denied any transfer of the $2000 policy in question, and accompanied the same with a letter setting forth their contention that the total insurance was $8000. The company refused to pay. $6000 was collected on the two other policies. Thereafter Mr. and Mrs. Firestone assigned their interest in the policy to the plaintiff.

On cross-examination Mr. Firestone denied having ever received a removal endorsement for the $2000 policy in question, and denied that he had ever attached it to the policy, or had removed it after the fire. He admitted having received other endorsements from the same agency in other insurance transactions, including the endorsement increasing the insurance on the building from $10,000 to $17,000. He said that instead of agreeing with the agent for the transfer of the $2000 policy to the warehouse, he wanted $2000 additional insurance thereon but never received such a policy. He did buy such a policy on the warehouse after the fire. He said apparently he had gone from August, 1944 to the following March without any insurance on the warehouse stock, but admitted that he had received no bill for a premium therefor, nor had he made any inquiry about it. He admitted telling the fire marshal that he intended to collect the $2000 on the policy sued on, and that the insurance company was trying to avoid paying it. He said that at the time of the fire they had $5400 worth of furniture in the warehouse. He recalled a conversation with the agent on August 17, 1944. This was after he had already received the policy in question, dated to take effect August 20. He said when he received the $7000 increase endorsement on the building policy through the mail he attached it to the policy, put the policy in the safe and sent the insurance company a check for the premium. He said he handled all the insurance matters for the partnership of himself and wife. After talking with the agent about insurance on the warehouse, he depended on the agent to get it for him. He did not realize until after the fire that he had not obtained insurance on the warehouse property. He said the agent had told him that the rate was higher on the warehouse property than at the store building. No bill was received

for additional premium, and after the fire the agent had told him that they had overlooked sending it,—that it would be collected at the end of the year.

On the part of the defendant the Deputy State Fire Marshal of Kansas testified that on the occasion of the fire he investigated it and on the next day met Mr. Firestone at the store; that the latter told him that he had $8000 insurance, but had transferred $2000 of it to the warehouse, leaving only $6000 on the fire loss; that this statement was made in the presence of a son of the Chief of Police and a Mr. Gage, a special agent for the National Board of Fire Underwriters. Later the witness called in Mr. Firestone and several employees of the store and at the time took notes of the conversation. Mr. Firestone told Mr. Gage that he might have received the removal endorsement but that it was not attached to the policy, and stated that he had "taken a whipping and there is $2000, you don't blame me for trying to get it"; that Mr. Firestone admitted that he might have ordered the transfer. Over the objection of plaintiff the court admitted parts of this witness's memorandum having to do with the statements made to the witness by Mr. Firestone during the conversations mentioned. Witness stated that this memorandum was a part of the official records of the State Fire Marshal's office at Topeka, Kansas.

Mr. Hartley, employee of the agency representing the defendant in Lawrence, Kansas, testified that he had done business with Mr. Firestone's predecessor at the store; that he had obtained the insurance policies existing at the time the Firestones purchased the stock which were for $8000, not counting the insurance on the building itself, and that the insurance on the merchandise was transferred to Mr. and Mrs. Firestone; that after the purchase the insurance on the building was increased by sending an endorsement thereof to Firestone which was later attached to the policy held by plaintiff on the building. On August 3, 1944, renewal policies were sent to the Firestones to cover the stock at the store, dated August 20, 1944. The witness stated that on August 17th, he noticed furniture in the building at 732 Massachusetts Street, and upon inquiry, found that it belonged to the Firestones, whereupon he went to see Mr. Firestone and suggested that he have insurance to cover the stock in the warehouse, and suggested a new policy to cover it, whereupon Firestone asked him how much he had on the store building, and upon being told he had $8000, he said "transfer the $2,000.00 just renewed down at the new place, 732 Massachusetts Street"; that thereupon witness returned to his office and prepared the necessary instructions for the transfer, as a binder, which contained the name of Bernard Firestone, address, 732 Massachusetts Street, date, August 17, 1944, "transfer $2000", with other data not material. On defendant's copy of the policy in question the removal permit from the store

to 732 Massachusetts Street was attached, and the address on the policy was changed by interlineation to the same effect. A copy of the removal endorsement was then sent to the company and the other copy was mailed to Mr. Firestone.

The removal permit was dated August 20, 1944, and, under its provisions, purported to grant permission within ten days thereafter to remove the property insured, at 808-810 Massachusetts to 732 Massachusetts Street, and, among other provisions, it provided that the same should take effect at the time such removal shall be made within ten days from date, or if not made at the expiration of ten days after date, the policy should attach to the new location only. It contained the words: "Attached to and forming part of policy #984035 of the North British and Mercantile Insurance Company, issued at its Lawrence, Kansas agency". The witness Hartley explained that the date coincided with that of the policy because the policy, already having been written and delivered, was not to take effect until August 20, 1944, and had been mailed to the insured on August 3rd. The witness testified that the rate at the warehouse was later found to be a little greater than that at the store, but of such small amount that no statement was sent to the insured therefor. He said that in such cases if collection was made, it would be made at the end of the year, or upon the next renewal. Witness said that he went to the store building on the occasion of the fire and Mr. Firestone asked him how much insurance he had on the stock, and witness told him that he would go to the office and check it up. He later returned and told Mr. Firestone that he had $6000 because he had transferred $2000 of the original $8000 to the warehouse. Mr. Firestone answered that he had forgotten whether he had transferred any of the insurance or not. Hartley said that he did not personally mail the removal permit to Mr. Firestone but the records in his office showed that it was so mailed; that the home office acknowledged receipt of same on August 21st. He did not know whether Firestone had transferred any goods from the store to the warehouse.

A lady clerk of the insurance agency testified that she dated the application for transfer on the 17th of August and sent inquiry to the Inspection Bureau for the new rate; that, nevertheless, she completed the papers and records on the 18th, and personally mailed copies of the endorsements to the home office, and to the insured. The other copy was attached to the daily record (policy) in the agency office. She testified that the rate at the warehouse was 11 cents on the hundred higher than at the store, but on account of the premium having already been paid on the policy, this excess would not be billed until the expiration of the policy. She admitted that the permit was the only writing the company and the Firestones had between them on the question of the removal.

304

Mr. Gage, Special Agent for the National Board of Fire Underwriters, said he investigated the fire and talked with Mr. Firestone on the day following the fire, and that Mr. Firestone had stated that he had $8000 on the merchandise, but had transferred a $2000 policy to the warehouse, and had only $6000 at the store at the time of the fire. In a conversation a few days later, in the presence of others, Mr. Firestone said he might have requested the transfer of the insurance and might have received the removal permit, but that he did not now have it,—but had suffered a severe loss and was going to make every effort to collect the $2000 policy in question. Mr. Firestone stated to witness that he intended to take the matter up with a lawyer friend in Kansas City, and try to collect it. On cross-examination the witness was asked if he had made notes of this conversation and he stated that he had. Counsel for plaintiff then asked that the same be produced and witness read from the notes: ''Bernard Firestone in alley back of the store on the day following a fire said in short interview had $6000. Had had $8000; transferred $2000 on store up street''. A similar memorandum of a later conversation was produced wherein substantially the same entry was made, except it stated that Firestone thought he had but $6000, but later when he got the policies, found that he had $8000; that the agent had said $2000 had been transferred.

In rebuttal Mr. Firestone said that after the fire had sufficiently subsided he obtained his policies and found that he had $8000 insurance. He denied telling the State Inspector that he had transferred $2000 and had only $6000 insurance, but said that the agent had made that statement.

At the close of all the evidence, the defendant moved for a directed verdict, which motion was overruled.

The policy sued on contains a printed paragraph at the end thereof as follows:

''This Policy is made and accepted subject to the foregoing and following stipulations and conditions, together with such other provisions, agreements, or conditions as may be endorsed hereon or added hereto, and no officer, agent, or other representative of this Company shall have power to waive any provision or condition of this policy except such as by the terms of this policy may be the subject of agreement endorsed hereon or added hereto, and as to such provisions and conditions no officer, agent, or representative shall have such power or be deemed or held to have waived such provisions or conditions unless such waiver, if any, shall be written upon or attached hereto, nor shall any privilege or permission affecting the insurance under this policy exist or be claimed by the Insured unless so written or attached. (The stipulations and conditions above referred to are set forth on the following pages of this policy.) ''.

At the upper left-hand corner of the first page of the policy there appear four sets of small holes similiar to pin holes, two holes in each set, and about one-fourth inch apart. The holes penetrate the second page in corresponding position.

Appellant has misconstrued Rule 1.08 and has set forth separately his assignments of error, whereas such is no longer required by that rule. The points relied on should specify the allegations of error. Appellant's thirteen points of error consist almost entirely of abstract statements of legal principles, without application to the case at hand. This requires us to consider each point relied on in the light of such of the separate specifications of error as are intended to apply. The fifteen specifications cover the subjects of improper instructions, inadmissibility of evidence, construction of documents, and general grounds.

Appellant's points of error, applied to the separate assignments of error as we construe them, may be condensed into the following: (1) the parties are bound by the provisions of the policy prohibiting unauthorized waiver of any of its terms by the company's agent, and that defendant is estopped to offer oral evidence to the contrary; (2) the plaintiff is not estopped to plead such provisions; (3) oral evidence is inadmissible to vary the terms of the policy, except to explain any ambiguity, or unless fraud in the procurement of the contract has been pleaded; (4) the removal permit was not a contract but a mere permission, and could not be effective until removal; (5) it must be construed as a whole, and any ambiguity therein must be construed in plaintiff's favor; (6) in the absence of pleading and proof of fraud, the policy will be enforced as issued; (7) the restrictions on the agent's apparent authority are valid; (8) there being no written modification of the policy attached thereto, the policy is the only evidence of the contract; (9) it was error to submit to the jury the issue of transfer; (10) the judgment should be reversed and remanded with instructions to enter judgment for the face of the policy, plus interest, plus attorney's fees to be determined by the trial court.

Substantially, the above points are directed to the alleged error on the part of the court in admitting evidence as to change in the policy respecting the location of the insured property, and submitting to the jury, in the instructions, the issue of whether or not an agreement was entered into for such change. It is apparent that the points pertain almost entirely to the quoted clause of the policy,—its construction, application, force and effect.

Let us first consider the "removal permit". It is true that it purports to grant to the insured permission to remove the insured property to an address other than that named in the policy as originally issued. But it is not correct to say that it does nothing more. It authorizes the removal within ten days from its date, and pro-

vides further that if the property be not so removed within that period the policy shall be effective only on the new location named. Assuming that the transfer was agreed to and that the permit was properly made a part of the policy, it clearly became effective not later than ten days after its date, and long before the fire. It does not contain the ambiguity which appellant claims.

But appellant denies that the insured agreed to the transfer, or received copy of the transfer endorsement, and denies that it was ever attached to the policy. The policy he pleaded and introduced did not contain it. Under such circumstances, the appellant contends, no oral evidence is admissible to prove the agreement to trasfer.

The contract between the parties was the policy of insurance. Such insurance contracts can be and are changed, or modified by the parties. It is provided that such may be done by endorsement in writing attached to the policy. The first step to effect such a change is for the parties to agree that the policy may be so modified. The next step is for the insurer to furnish the appropriate endorsement setting forth the changes agreed to and identifying the policy to which it shall be attached. According to defendant's evidence it did, as usual, attach the removal endorsement to its copy of the policy and to the copy held by its agent, and promptly mailed the copy to the insured to attach to the original policy. If all this was authorized and agreed to by the insured, as the jury found from the evidence, it cannot be said that because the insured's policy now contains no attached copy of the endorsement, the transfer was never agreed to and never took effect, nor that no oral proof is admissible to show the agreement and the steps taken to effectuate it.

There was substantial evidence from which the jury could reasonably have believed that the insured did order and agree to the transfer; that they did receive a copy of the endorsement; and, in fact, there is some physical evidence tending to indicate that the endorsement was at one time attached to the policy held by the insured, and later removed. Couch, Cyclopedia of Insurance Law, Vol. 8, p. 7156; First Nat'l Bank v. Home Ins. Co., 274 Pa. 129, 118 Atl. 17. Such an endorsement, issued and delivered to an insured, under such circumstances, would enable the insured, under appellant's theory, to shift his insurance protection with impunity from one location to another by the mere attaching or withholding of the endorsement. We do not believe that such is the effect of the quoted clause of the policy, and that under the circumstances shown in defendant's evidence it was for the jury to determine whether the transfer was ordered by the insured and whether the steps had been taken to comply therewith as testified to by defendant's witnesses.

Furthermore, the agent in this case, having authority to issue and sign policies and endorsements, and to collect premiums, was the

general agent for the defendant and had the authority to waive or to agree to a change or modification in the policy, notwithstanding the quoted clause to the contrary. Block v. U. S. Fid. & Guar. Co., 316 Mo. 278, 294, 290 S. W. 429. See, also, Bergerson v. General Ins. Co. of America, 232 Mo. App. 549, 105 S. W. 2d 1015, 1018. This is the law in Missouri, whatever may be the law of other states. And this is true notwithstanding the fact that the removal permit was or was not attached to the original policy, or whether or not the permit in fact had been received by plaintiff. It is the agreement that controls. The written endorsement to be attached is merely the evidence of the agreement. Bealmer v. Hartford Ins. Co., 193 S. W. 847, 849.

In view of the foregoing, it was not error to admit the oral evidence objected to, nor to submit the matter of the transfer to the jury in the instructions. We find no error in the trial of the cause Judgment affirmed. All concur.